IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-53

 No. 291A20

 Filed 23 April 2021

 IN THE MATTER OF: N.B., N.M.B., M.R.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 9 March

 2020 by Judge Joseph Moody Buckner in District Court, Orange County. This matter

 was calendared for argument in the Supreme Court on 19 March 2021 but was

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 Stephenson & Fleming, LLP, by Angenette Stephenson, for petitioner-appellee
 Orange County Department of Social Services.

 Olabisi A. Ofunniyin and Matthew W. Wolfe for appellee Guardian ad Litem.

 Dorothy Hairston Mitchell for respondent-appellant mother.

 J. Thomas Diepenbrock for respondent-appellant father.

 ERVIN, Justice.

¶1 Respondent-mother Stacey W. appeals from the trial court’s orders

 terminating her parental rights in N.B., N.M.B., and M.R., while respondent-father

 Jerald B. appeals from the trial court’s order terminating his parental rights in N.B.1

 1 N.B., N.M.B., and M.R., respectively, will be referred to throughout the remainder

 of this opinion as Natasha, Nylah, and Merise, which are pseudonyms used for ease of reading
 and to protect the juveniles’ privacy.
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 After careful review of the record in light of the applicable law, we affirm the trial

 court’s orders.

 I. Factual Background

¶2 On 25 July 2017, a child protective services agency in Hagerstown, Maryland,

 received a referral expressing concern that Natasha and Nylah had been neglected

 by a woman with whom they had lived in Maryland during a time in which

 respondent-mother had been incarcerated. At the time of the making of this referral,

 Natasha, Nylah, and Merise were residing in Chapel Hill with the sister of a woman

 that respondent-mother described as her “foster mother” and that the children

 referred to as their “great-aunt” despite the absence of any biological relationship

 between this individual and either respondent-mother or the children. The children

 had begun living with this individual in January 2017, when this individual had

 traveled to Maryland and retrieved the children in light of respondent-mother’s

 incarceration and the inability of the persons with whom the children had initially

 been left to provide adequate care for them.

¶3 Upon learning that the children had been living in Chapel Hill for the last six

 months, the Maryland child protective services agency contacted the Orange County

 Department of Social Services, which undertook responsibility for investigating the

 report. At the time that DSS became involved with the children, respondent-mother,
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 who had been released on parole, had been unable to establish consistent employment

 or housing while respondent-father was incarcerated.

¶4 In the course of the investigation, Natasha and Nylah reported that

 respondent-mother had frequently been incarcerated and that they had been

 subjected to inappropriate discipline by caretakers, had been exposed to illegal drugs,

 and had endured inappropriate touching. In light of these allegations of abuse, a

 child medical evaluation was conducted upon Natasha and Nylah on 14 September

 2017. At the conclusion of the examination, the examiner expressed concern that

 both Natasha and Nylah had been physically and sexually abused.

¶5 On 3 November 2017, DSS filed juvenile petitions alleging that Natasha,

 Nylah, and Merise were abused, neglected, and dependent juveniles. In its petitions,

 DSS asserted that respondent-mother had a history of incarceration, during which

 the children had lived with multiple caretakers who subjected the children to

 excessive discipline, failed to provide the children with adequate food, and failed to

 provide the children with an adequate level of care. In addition, DSS alleged that the

 children had been physically and sexually abused while in respondent-mother’s care

 and that respondent-mother had been released from incarceration and was

 threatening to remove the children from the home of their current caretaker. In order

 to prevent respondent-mother from taking the children into her care, DSS sought and

 obtained the entry of an order placing the children into nonsecure custody and
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 allowing them to continue living with their current caretaker. Eventually, the

 children’s caretaker became unable to care for them, so that the children entered

 foster care.

¶6 After an adjudicatory hearing held on 15 February 2018, the trial court entered

 an order on 26 March 2018 finding that the children were neglected and dependent

 juveniles. The trial court ordered that the custody of the children remain with DSS,

 required respondent-mother to comply with a family services agreement, and

 authorized respondent-mother to engage in supervised visitation with the children.

 In view of the fact that respondent-father continued to be incarcerated, the trial court

 ordered him to provide DSS with a specific release date.

¶7 On 19 July 2018, the trial court held an initial permanency planning hearing.

 On 31 August 2018, the trial court entered a permanency planning order in which it

 found that, while DSS had made reasonable efforts to reunify the children with their

 parents, neither respondent-mother nor respondent-father had been actively

 attempting to successfully reunify with the children or making themselves available

 to DSS. As a result, the trial court adopted a primary permanent plan of adoption,

 with a secondary permanent plan of reunification, and authorized DSS to seek the

 termination of the parents’ parental rights in the children.

¶8 On 21 October 2019, DSS filed separate motions seeking to have respondent-

 mother’s parental rights in all three children terminated based upon neglect,
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 N.C.G.S. § 7B-1111(a)(1), and willful failure to make reasonable progress toward

 correcting the conditions that had led to the children’s placement in DSS custody,

 N.C.G.S. § 7B-1111(a)(2). In addition, DSS alleged that respondent-mother’s

 parental rights in Natasha were subject to termination based upon abandonment,

 N.C.G.S. § 7B-1111(a)(7). Similarly, DSS filed a motion seeking to have respondent-

 father’s parental rights in Natasha terminated on the basis of neglect, N.C.G.S. § 7B-

 1111(a)(1); willful failure to make reasonable progress toward correcting the

 conditions that had led to Natasha’s placement in DSS custody, N.C.G.S. § 7B-

 1111(a)(2); and dependency. N.C.G.S. § 7B-1111(a)(6).

¶9 On 28 November 2018, after a hearing held on 1 November 2018, Judge

 Beverly Scarlett entered a permanency planning order in which she found that DSS

 continued to have difficulty in communicating with respondent-mother, that

 respondent-mother had sent clothing to the children on three occasions, and that

 respondent-father continued to be incarcerated. In addition, Judge Scarlett

 reiterated the trial court’s earlier conclusion that neither parent was making

 adequate progress toward reunification with the children. As a result, Judge Scarlett

 retained the existing primary permanent plan of adoption and secondary permanent

 plan of reunification.

¶ 10 After a hearing held on 6 February 2020, the trial court entered orders on 9

 March 2020 in which it determined that respondent-mother’s parental rights in all
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 three children and respondent-father’s parental rights in Natasha were subject to

 termination based upon neglect, N.C.G.S. § 7B-1111(a)(1), and willful failure to make

 reasonable progress toward correcting the conditions that had led to the children’s

 placement in DSS custody, N.C.G.S. § 7B-1111(a)(2); that respondent-mother’s

 parental rights in Natasha were subject to termination based upon abandonment,

 N.C.G.S. § 7B-1111(a)(7); and that respondent-father’s parental rights in Natasha

 were subject to termination for dependency, N.C.G.S. § 7B-1111(a)(6). In addition,

 the trial court concluded that the children’s bests interests would be served by the

 termination of respondent-mother’s parental rights in all three children and that

 Natasha’s best interests would be served by the termination of respondent-father’s

 parental rights.2 Respondent-mother and respondent-father noted appeals to this

 Court from the trial court’s termination orders.

 II. Substantive Legal Analysis

 A. Respondent-Mother’s Appeal

¶ 11 In seeking relief from the trial court’s termination orders before this Court,

 respondent-mother contends that the trial court erred by concluding that her

 parental rights in the children were subject to termination. A termination of parental

 2 At the time of the termination hearing, paternity for Nylah had not been established.

 As a result, a proceeding to terminate the unknown father’s parental rights in Nylah had
 been initiated and service of the unknown father by publication was in process. Although
 paternity for Merise had not yet been established either, a putative father had been identified
 and DSS was making efforts to determine whether that individual was actually Merise’s
 father.
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 rights proceeding consists of an adjudicatory stage and a dispositional stage.

 N.C.G.S. §§ 7B-1109, -1110 (2019); In re Montgomery, 311 N.C. 101, 110 (1984). At

 the adjudicatory stage, the petitioner bears the burden of proving by “clear, cogent,

 and convincing evidence” the existence of one or more of the grounds for termination

 delineated in N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(f) (2019). This Court

 reviews a trial court’s adjudicatory decision “to determine whether the findings are

 supported by clear, cogent and convincing evidence and the findings support the

 conclusions of law.” In re Montgomery, 311 N.C. at 111, 316 S.E.2d at 253 (citing In

 re Moore, 306 N.C. 394, 404 (1982)). In the event that the petitioner was able to prove

 the existence of one or more grounds for termination, “the court proceeds to the

 dispositional stage, at which the court must consider whether it is in the best

 interests of the juvenile to terminate parental rights.” In re D.L.W., 368 N.C. 835,

 842 (2016) (citing In re Young, 346 N.C. 244, 247 (1997); N.C.G.S. § 7B-1110). “[A]n

 adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a

 termination of parental rights.” In re E.H.P., 372 N.C. 388, 395 (2019).

¶ 12 A trial court may terminate parental rights for neglect pursuant to N.C.G.S.

 § 7B-1111(a)(1) in the event that it concludes that the parent has neglected the

 juvenile as that term is defined in N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1)

 (2019). A neglected juvenile is defined, in pertinent part, as a juvenile “whose parent,

 guardian, custodian, or caretaker does not provide proper care, supervision, or
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

discipline; . . . or who lives in an environment injurious to the juvenile’s welfare . . . .”

N.C.G.S. § 7B-101(15) (2019). Although the trial court is authorized to terminate a

parent’s parental rights in a juvenile based upon neglect that is occurring at the time

of the termination hearing, see, e.g., In re K.C.T., 375 N.C. 592, 599–600 (2020)

(stating that “this Court has recognized that the neglect ground can support

termination . . . if a parent is presently neglecting their child by abandonment”), the

fact that “a child has not been in the custody of the parent for a significant period of

time prior to the termination hearing” would make “requiring the petitioner in such

circumstances to show that the child is currently neglected by the parent . . .

impossible.” In re N.D.A., 373 N.C. 71, 80 (2019) (cleaned up). In such a situation,

“evidence of neglect by a parent prior to losing custody of a child — including an

adjudication of such neglect — is admissible in subsequent proceedings to terminate

parental rights[,]” but “[t]he trial court must also consider any evidence of changed

conditions in light of the evidence of prior neglect and the probability of a repetition

of neglect.” In re Ballard, 311 N.C. 708, 715 (1984). As a result, the trial court is also

entitled to find that the parent’s parental rights are subject to termination on the

basis of neglect if it concludes that the evidence demonstrates “a likelihood of future

neglect by the parent.” In re R.L.D., 375 N.C. 838, 841 (2020). As a result, even if

the record is devoid of any evidence tending to show the existence of current neglect,

the trial court may find that a parent’s parental rights are subject to termination
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 based upon a determination of past neglect and a showing that a repetition of neglect

 is likely if the child is returned to the parent’s care, id., at 841, n.3, with the trial

 court being required to evaluate the likelihood of future neglect on the basis of an

 analysis of any “evidence of changed circumstances occurring between the period of

 past neglect and the time of the termination hearing.” In re Z.V.A., 373 N.C. 207,

 212, 835 S.E.2d 425, 430 (2019) (citing Ballard, 311 N.C. at 715).

¶ 13 The record reflects that the trial court found that the children were neglected

 in an adjudication order that was entered on 26 March 2018. In addition, the trial

 court found that, prior to the children’s placement in DSS custody, there was a

 “pattern of neglect due to housing instability; substance abuse, specifically cocaine;

 leaving the juvenile[s] with inappropriate caretakers . . . ; and domestic violence

 between Respondent parents.” In addition, the trial court found that, prior to the

 time at which DSS obtained custody of the children and while she was pregnant with

 Merise, respondent-mother and the children had resided at a Salvation Army shelter;

 that, after respondent-mother’s incarceration for drug violations, she had failed to

 make proper arrangements for the children’s care; that Merise, when she was an

 infant, had been “found alone in a car outside a courthouse”; that, following

 respondent-mother’s release from incarceration, she had failed to visit with the

 children or provide financial assistance for their care; that respondent-mother lived

 in a half-way house while on parole and had failed to establish safe, stable, and
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 suitable housing for the juveniles; that a child medical examination had resulted in

 a determination that Natasha and Nylah had been physically and sexually abused

 and that they had suffered trauma because of respondent-mother’s failure to protect

 them; and that respondent-mother had exposed Natasha and Nylah to “multiple

 unsafe situations involving but not limited to inappropriate discipline, inappropriate

 supervision resulting in abuse, and inadequate food.” Based upon these findings of

 fact, the trial court determined in all three termination orders that:

 Much of the neglect experienced by the juvenile[s] is
 directly related to Respondent mother’s instability, drug
 use, incarcerations, and placement with multiple
 caretakers to whom Respondent mother entrusted that
 subjected the juvenile[s] to physical and sexual abuse as
 well as neglect.

¶ 14 According to respondent-mother, the quoted finding demonstrates that the

 trial court relied upon a showing of past neglect rather than upon an analysis of the

 circumstances that existed at the time of the termination hearing in determining that

 her parental rights in the children were subject to termination on the basis of neglect.

 Instead of evidencing a determination that respondent-mother’s parental rights in

 the children should be terminated based solely upon evidence of past neglect,

 however, we interpret the quoted language as nothing more than a summary of the

 prior neglect to which the children had been subjected. In reaching this conclusion,

 we particularly note the trial court’s findings that, after DSS obtained custody of the

 children, respondent-mother had failed to maintain consistent contact with them and
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 did not understand or acknowledge the negative impact that the manner in which

 she had chosen to live and the identity of the caretakers with whom she had placed

 the children had had upon them.

¶ 15 The trial court’s findings also reflect that respondent-mother did not enter into

 a case plan with DSS until 1 November 2018, which was more than a year after they

 had been placed in DSS custody. The trial court found that the terms and conditions

 set out in respondent-mother’s court-ordered case plan required her to comply with a

 visitation agreement; resolve all of her pending legal matters; obtain and maintain

 housing that was sufficient for herself and the juveniles; provide verification of the

 stability of her housing arrangements through the provision of a lease agreement;

 obtain and maintain lawful employment that produced sufficient income to meet her

 own needs and those of the children; verify the nature and amount of her income by

 providing copies of pay stubs; refrain from the use of illegal or impairing substances

 and submit to random drug screens; comply with the requirements of her parole;

 obtain comprehensive mental health and substance abuse assessments and comply

 with any resulting recommendations; complete parenting education and demonstrate

 the ability to use the skills that she had learned as the result of that process; maintain

 consistent contact with DSS; sign releases authorizing the provision of information

 allowing DSS to verify her compliance with the components of her case plan; and

 provide certificates showing that she had satisfied the conditions of her release on
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

parole and her compliance with the other provisions of her case plans. In addressing

the extent of respondent-mother’s compliance with the provisions of her case plan,

the trial court made the following unchallenged findings of fact:3

 54. [DSS] has had ongoing difficulty in Respondent
 mother signing releases for service[] providers or
 obtaining documentation about completed services.

 ....

 59. A letter from Alternative Drug and Alcohol
 Counseling, LLC was admitted and received by the
 Court to Respondent mother’s parole officer
 indicating successful completion of treatment. She
 did not previously provide this documentation.
 Documentation of completed drug screens was never
 received.

 60. While on probation, Respondent mother was
 engaged in Potomoc Case Management Services.
 She did not provide documentation to or sign
 releases for [DSS] to obtain information about
 engagement in services or services offered by the
 agency.

 ....

 62. Due to lack of releases or documentation, it cannot
 be determined whether Respondent mother
 completed a comprehensive mental health

 3 There are minor variations in the numbering of the findings of fact contained in the

separate different orders that the trial court entered with respect to each of the juveniles. In
the interests of brevity and for ease of reference, we will quote the trial court’s findings as set
out in the order terminating respondent-mother’s parental rights in Natasha in the text of
this opinion. As a result of the fact that respondent-mother has failed to challenge any of
these findings as lacking in sufficient evidentiary support, they are binding upon us for
purposes of appellate review. In re T.N.H., 372 N.C. 403, 407 (2019).
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 assessment or whether engagement in case
 management services adequately addressed her
 mental health needs.

63. After completing parole in Maryland, Respondent
 mother relocated to Yonkers, New York where the
 maternal grandmother resides.

....

65. Despite the distance from the juvenile[s],
 Respondent mother could have consistently
 communicated with [DSS], executed releases for
 providers, provided verification of engagement in
 services, and appropriately participate[d] in case
 planning.

....

67. In June 2019, Respondent mother provided a drug
 and alcohol counseling letter for Alssaro Counseling
 Services in New York; however, [DSS] was unable to
 confirm that Respondent mother was engaged in
 their services.

68. Respondent mother subsequently indicated that she
 did not use Alssaro Counseling Services due to
 insurance issues and having to find another
 provider.

69. Respondent mother reports being drug tested, but
 she has not provided any documentation of
 completed negative drug screens.

70. On August 1, 2019, when Respondent mother was
 present for a Permanency Planning Review Hearing,
 [DSS] referred Respondent mother for a hair follicle
 drug screen.
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 71. Respondent mother failed to complete the requested
 hair follicle drug screen.

 72. Respondent mother provided the results of a blood
 test from Empire City Laboratories completed on
 January 2, 2020; however, the test appears to be
 related to immunizations and communicable
 diseases. The test did not screen for substances.

 ....

 75. Respondent mother has not completed a parenting
 curriculum and applied learned knowledge of skills
 to address her deficits.

 76. Respondent mother continues to have housing
 instability. She reports renting a room or subletting
 an apartment; however, she has not provided an
 address to [DSS] or a copy of a lease or other housing
 agreement. Respondent mother receives her mail at
 the maternal grandmother’s home.

Based upon these findings of evidentiary fact, the trial court determined that:

 Respondent mother’s continued failure to maintain a safe
 and stable home, and her failure to assure that the
 juvenile[s] received proper supervision and necessary care
 subjects the juvenile[s] to the risks of physical and
 emotional harm and creates an environment injurious to
 [their] welfare.

The trial court also noted that Natasha and Nylah had “heightened trauma-related

therapeutic needs due to Respondent mother’s neglect” and that Nylah had required

residential treatment for the purpose of addressing her mental health problems and

accompanying behaviors. According to the trial court, the neglect that the juveniles

had suffered in the past was likely to “repeat or continue” in the event that the
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 juveniles were returned to respondent-mother’s care, with this determination resting

 upon evidence concerning the prior neglect that the juveniles had experienced

 coupled with respondent-mother’s failure to establish a “safe, stable, substance-free

 home”; her lack of contact with the juveniles; and her inability to address the

 juveniles’ trauma-related needs.

¶ 16 In response, respondent-mother asserts that the trial court’s findings do little

 more than restate earlier findings and that certain of them lack sufficient evidentiary

 support. However, the record does not support respondent-mother’s contentions. For

 example, respondent-mother conceded that, at the time of the termination hearing,

 she was subletting a single room for herself, admitted that she did not have a lease,

 and acknowledged having lived with a friend before beginning to rent the room that

 she occupied at the time of the termination hearing. In light of this evidence, the trial

 court could have properly determined that respondent-mother had failed to establish

 stable housing that was suitable for both herself and the juveniles. See In re D.L.W.,

 368 N.C. at 843 (stating that it is the trial court’s duty to consider all of the evidence,

 to pass upon the credibility of the witnesses, and to determine the inferences that

 should be drawn from that evidence).

¶ 17 In addition, the record reflects that respondent-mother’s case plan required

 her to submit to random drug screens. According to a social worker who testified at

 the termination hearing, respondent-mother never submitted to random drug
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 screens. The same social worker testified that, even though DSS had requested that

 respondent-mother submit to a hair follicle screen when she was in North Carolina

 in August 2019, she failed to do so. For that reason, the social worker testified that

 DSS had been unable to verify that respondent-mother had maintained sobriety. As

 a result, the trial court had ample justification for concluding that respondent-mother

 had failed to overcome her substance abuse problems.

¶ 18 As far as the issue of visitation is concerned, the record reflects that Natasha

 did not wish to have any contact with respondent-mother, whom she blamed for

 causing the circumstances in which the children found themselves. In addition, the

 record contains evidence tending to show that, for a period of time, Nylah lacked the

 stability to permit visitation with respondent-mother. A social worker testified that

 respondent-mother had a “strained relationship” with Merise in light of respondent-

 mother’s “lack of involvement” with the child and asserted that respondent-mother

 had not seen Merise since her incarceration, which had occurred when Merise was

 four months old, and that Merise did not recognize respondent-mother. On the one

 occasion when she actually visited with Merise, respondent-mother only spent half of

 her allotted visitation time with the child. For all of these reasons, we hold that the

 record contains ample support for the trial court’s determination that there had been

 little contact between respondent-mother and the children.
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

¶ 19 The record also contains sufficient evidence to support the trial court’s

 determination that respondent-mother had failed to demonstrate the ability to deal

 with the juveniles’ “trauma-related needs and accompanying behavior[s].” Although

 respondent-mother testified that she was being treated for depression, she never

 provided any verification that tended to show the completion of a comprehensive

 mental health assessment or that she had been complying with any resulting

 treatment recommendations. In addition, a social worker and a social work

 supervisor both testified that respondent-mother had a limited understanding of the

 mental health problems from which the children suffered. According to both the

 social worker and the social work supervisor, respondent-mother believed that the

 children “just want to come home.” Moreover, the social worker testified that, in light

 of Natasha and Nylah’s special needs, both children needed a caretaker who

 thoroughly understood their mental health diagnoses and related treatment needs

 and that respondent-mother did not appear to have these attributes. Finally, a social

 worker testified that she had been unable to verify that respondent-mother had

 completed the parenting class required by her case plan. As a result, the trial court

 had ample justification for concluding that respondent-mother was not prepared to

 address the juveniles’ trauma-related needs.

¶ 20 Although respondent-mother contends that the trial court failed to give proper

 consideration to the progress that she had made and the extent to which her
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

circumstances had changed since her release from incarceration and that the trial

court’s determination that “[t]he risk [to the juveniles of] continued mental, physical,

and emotion[al] impairment if [they were] in Respondent mother’s custody remains”

lacked sufficient record support, we are not persuaded by this argument. The trial

court’s orders contain numerous findings describing the components of her case plan

that respondent-mother successfully completed. For example, the trial court found

that respondent-mother had successfully satisfied the terms and conditions of her

parole and that respondent-mother had obtained gainful employment. According to

well-established North Carolina law, however, respondent-mother’s compliance with

a portion of her case plan “does not preclude a finding of neglect.” In re J.J.H., 376

N.C. 161, 184 (2020) (citing In re D.W.P., 373 N.C. 327, 339–40 (2020)); see also In re

Y.Y.E.T., 205 N.C. App. 120, 131 (2010) (acknowledging that a “case plan is not just

a check list” and that “parents must demonstrate acknowledgement and

understanding of why the juvenile entered DSS custody as well as changed

behaviors”). Although respondent-mother had made some progress toward satisfying

the requirements of her case plan, the trial court could reasonably determine, based

upon the prior neglect that the children had experienced, respondent-mother’s failure

to establish stable housing that was free from substance abuse, respondent-mother’s

lack of contact with the juveniles, and respondent-mother’s inability to meet the

children’s trauma-related needs, that future neglect was likely in the event that they
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 were returned to her care, see In re M.A., 374 N.C. 865, 870 (2020) (holding that, even

 though the respondent claimed to have made reasonable progress toward satisfying

 the requirements of his case plan, the trial court’s findings relating to his failure to

 adequately address the issue of domestic violence, which had been the primary reason

 for the children’s removal from the family home, were, “standing alone, sufficient to

 support a determination that there was a likelihood of future neglect”), and that

 respondent-mother’s parental rights in the children were subject to termination on

 the basis of neglect. As a result, since the trial court’s conclusion that a single ground

 for termination exists is sufficient, in and of itself, to support termination of

 respondent-mother’s parental rights, In re E.H.P., 372 N.C. at 395, and since

 respondent-mother has not argued that the trial court’s determination that

 termination of her parental rights would be in the children’s best interests

 constituted an abuse of discretion, see N.C.G.S. § 7B-1110(a) (2019), we affirm the

 trial court’s orders terminating respondent-mother’s parental rights in all three

 children.

 B. Respondent-Father’s Appeal

¶ 21 Similarly, respondent-father argues that the trial court erred by concluding

 that his parental rights in Natasha were subject to termination. In determining that

 respondent-father’s parental rights in Natasha were subject to termination for

 neglect pursuant to N.C.G.S. § 7B-1111(a)(i), the trial court made findings of fact
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 describing the circumstances that led to Natasha’s placement in DSS custody and

 noting that respondent-father had been incarcerated and had failed to take any action

 to facilitate a placement for Natasha when she entered foster care. In addition, the

 trial court found that:

 41. Respondent father is incarcerated . . . [in]
 Huntingdon, Pennsylvania. He has a tentative
 release date in 2021.

 42. Respondent father has not provided any tangible
 items for the juvenile or otherwise provided financial
 assistance to support the juvenile. His ability is
 limited by incarceration.

 43. Respondent father did not remain in consistent
 contact with [DSS] while the juvenile has been in
 foster care.

 44. Recently, contact with Respondent father has
 improved. He has acknowledged and expressed
 remorse for his inability to protect the juvenile from
 abuse and neglect due to multiple inappropriate
 caretakers.

 45. Respondent father did not correspond or sen[d]
 letters to the juvenile until a recent letter in which
 he expressed how much he cared for the juvenile and
 to ask for forgiveness.

¶ 22 In his initial challenge to the trial court’s termination order, respondent-father

 argues that Finding of Fact No. 42 lacks sufficient evidentiary support. After

 conceding that a social worker had testified that he had failed to provide any financial

 assistance to Natasha’s caretaker, respondent-father directs our attention to the

 report relating to Natasha’s child medical examination, in which Natasha’s caretaker
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 had stated that respondent-father was “help[ing] out materially and financially to

 provide for . . . [Natasha].” As we have previously noted, however, the trial court is

 responsible for resolving such contradictions in the record evidence. See In re D.L.W.,

 368 N.C. at 843. As a result, we hold that Finding of Fact No. 42 has sufficient record

 support.

¶ 23 Secondly, respondent-father contends that Finding of Fact No. 43 conflicts with

 the record evidence. In support of this contention, respondent-father points to

 evidence that (1) he contacted the guardian ad litem on 9 November 2017 for the

 purpose of offering to assume responsibility for caring for Natasha and Nylah

 following his release from incarceration; (2) that DSS had noted in a February 2018

 court report that respondent-father had signed and returned the information release

 and consent forms that DSS had sent to him; and (3) that respondent-father had

 informed DSS on 25 October 2018 that he might be released prior to his tentative

 release date, that he did not wish to relinquish his parental rights, that he hoped to

 reunify with Natasha, and that he wanted a social worker to tell Natasha that he

 loved and missed her.

¶ 24 Although the record clearly reflects that respondent-father had some contact

 with DSS, it also supports the trial court’s finding that his contacts with DSS had

 been inconsistent. For example, the record evidence tends to show that respondent-

 father had not had any contact with DSS between late 2018 and the preparation of a
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 court report in February 2020, in which DSS had stated that “[c]ontact with

 [respondent-father] has been inconsistent until recently when he reached out

 wanting to discuss his case[.]” The court report further indicated that DSS had been

 able to maintain contact with respondent-father in recent months and that he had

 expressed remorse about his inability to care for and protect Natasha when she

 needed his help. Although respondent-father did send Natasha a letter in which he

 asked for her forgiveness and made clear how much he cared for her, the letter in

 question had been his first contact with Natasha after her entry into DSS custody.

 As a result, the record adequately supports the trial court’s finding concerning the

 inconsistency of respondent-father’s contacts with DSS.4

¶ 25 The trial court further found that the neglect that Natasha had experienced

 was likely to “repeat or continue” in the event that she was returned to respondent-

 father’s care, with the trial court having based this finding upon the evidence

 concerning the neglect that Natasha had previously suffered, the fact that the neglect

 that led to Natasha’s placement in DSS custody had occurred while he was

 incarcerated, and the fact that Natasha had been temporarily placed in foster care

 while in respondent-father’s custody in 2007. In addition, the trial court found that,

 because of his lack of regular contact with Natasha and the fact of his incarceration,

 4 We also note that the trial court softened the import of Finding of Fact No. 43 in

 Finding of Fact No. 44 by noting the recent improvements in the level of contact between
 respondent-father and DSS.
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 respondent-father had failed to ensure that Natasha had received appropriate care

 and supervision. The trial court further found that respondent-father’s “criminal

 activity and absence from the juvenile’s life constitutes abandonment resulting in his

 inability to protect her from abuse and neglect [which] subject[ed] the juvenile to

 physical and emotional harm.” Finally, the trial court found that respondent-father

 remained incarcerated, that it was “unclear whether reentry upon release will be

 successful[,]” and that respondent-father “does not have the present or near future

 ability to establish a safe home for the juvenile.”

¶ 26 In respondent-father’s view, the record did not contain sufficient evidence to

 support a finding that Natasha experienced neglect while in his care, with the only

 support for this assertion consisting of references contained in child protective

 services reports from 2007 to 2016. According to respondent-father, the statements

 in question constituted mere allegations and were, for the most part, directed toward

 conduct in which respondent-mother had engaged. A careful review of the record

 reflects, however, that a social worker had testified that, in 2007, Natasha had been

 placed in foster care as the result of concerns relating to domestic violence, drug

 distribution, and respondent-father’s use of drugs. In light of this evidence, the trial
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 court was entitled to infer that neglect by respondent-father had resulted in

 Natasha’s placement in foster care in 2007. See In re D.L.W., 368 N.C. at 843.5

¶ 27 In addition, respondent-father argues that the trial court’s references to his

 incarceration as having resulted in neglect or abandonment rested upon a

 misapprehension of law given that “[i]ncarceration, standing alone, is neither a sword

 nor a shield in a termination of parental rights decision,” In re Yocum, 158 N.C. App.

 198, 207–08, aff’d 357 N.C. 568 (2003), with the trial court having erroneously

 predicated its determination that he had neglected Natasha upon the mere fact of his

 incarceration. Id. Although the trial court did find that respondent-father had failed

 to send any tangible items for Natasha’s benefit or to provide her caretakers with

 financial assistance, it acknowledged that respondent-father’s incarceration limited

 his ability to do so. Cf. In re A.J.P., 375 N.C. 516, 530 (2020) (stating that “[a] parent’s

 incarceration is a circumstance that the trial court must consider in determining

 whether the parent has made reasonable progress toward correcting those conditions

 which led to the removal of the juvenile” (cleaned up)). The trial court also found

 that, during his period of incarceration, respondent-father made no attempt to

 5 Even if this finding lacked sufficient evidentiary support, any such defect would not

 fatally undermine the trial court’s order given the absence of any dispute about whether
 Natasha had been adjudicated to be a neglected juvenile in 2018. See In re M.A.W., 370 N.C.
 149, 153 (2017) (holding that a prior adjudication of neglect based on a mother’s substance
 abuse and mental health issues was “appropriately considered” by the trial court as “relevant
 evidence” in proceedings to terminate the parental rights of a father who was incarcerated at
 the time of the prior adjudication).
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

contact Natasha, with the exception of sending a single letter, and that he had had

limited contact with DSS. See In re S.D., 374 N.C. 67, 75–76 (2020) (stating that

“incarceration does not negate a father’s neglect of his child because the sacrifices

which parenthood often requires are not forfeited when the parent is in custody,” so

that, “while incarceration may limit a parent’s ability to show affection, it is not an

excuse for a parent’s failure to show interest in a child’s welfare by whatever means

available” (cleaned up)). Finally, the trial court made the unchallenged finding that,

when respondent-father was not incarcerated, “he was only involved in the juvenile’s

life in a limited way[.]” As a result, while the trial court did refer to respondent-

father’s incarceration in its findings of fact, it did so only in the context of

acknowledging the limitations upon his ability to take certain steps that would have

helped him develop and maintain a relationship with Natasha that resulted from his

incarceration rather than basing its finding of neglect solely upon the fact that he

was incarcerated. As a result, after a careful examination of the record, we hold that

the trial court did not err by concluding that a repetition of neglect was likely, see In

re O.W.D.A., 375 N.C. 645, 653–54 (2020) (stating that “evidence of changed

conditions must be considered in light of the history of neglect by the parents and the

probability of a repetition of neglect” and that, although respondent-father had made

some recent, minimal progress in attempting to reunify with Natasha, “the trial court

was within its authority to weigh the evidence and determine that these eleventh-
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 hour efforts did not outweigh the evidence of his persistent failures to make

 improvements . . . and to conclude that there was a probability of repetition of neglect”

 (citation omitted)), and that respondent-father’s parental rights in Natasha were

 subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 28 Secondly, respondent-father contends that he received ineffective assistance of

 counsel at the termination hearing. In respondent-father’s view, the failure of his

 trial counsel to ensure that he was able to attend the termination hearing on a remote

 basis and the fact that his trial counsel failed to present evidence, cross-examine

 witnesses, lodge any objections, or advance any arguments on respondent-father’s

 behalf constituted deficient performance that prejudiced his chances for a more

 favorable outcome at the termination hearing. We do not find respondent-father’s

 argument persuasive.

¶ 29 A “parent has the right to counsel, and to appointed counsel in cases of

 indigency, unless the parent waives the right,” in a termination of parental rights

 proceeding. N.C.G. S. § 7B-1101.1(a) (2019). “Counsel necessarily must provide

 effective assistance, as the alternative would render any statutory right to counsel

 potentially meaningless.” In re T.N.C., 375 N.C. 849, 854, 851 S.E.2d 29, 33 (2020).

 “To prevail on a claim of ineffective assistance of counsel, respondent must show that

 counsel’s performance was deficient and the deficiency was so serious as to deprive

 [him] of a fair hearing.” Id. (cleaned up). “To make the latter showing, the respondent
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

 must prove that ‘there is a reasonable probability that, but for counsel’s errors, there

 would have been a different result in the proceedings.’ ” Id. (quoting State v.

 Braswell, 312 N.C. 553, 563, 324 S.E.2d 241, 248 (1985)).

¶ 30 A careful examination of respondent-father’s brief clearly demonstrates that

 he has failed to show that he suffered any prejudice as a result of the allegedly

 deficient performance of his trial counsel. Simply put, nothing in the record suggests

 that there was anything that respondent-father’s trial counsel could have done to

 overcome the obstacles that he faced in this case arising from the undisputed evidence

 that respondent father had failed to make any significant effort to prevent Natasha

 from entering into DSS custody and had failed to take significant steps to develop

 and maintain a relationship with Natasha or to remain in consistent contact with

 DSS once Natasha had entered DSS custody. Thus, we hold that respondent-father

 is not entitled to relief from the trial court’s termination order on the basis of

 ineffective assistance of counsel. As a result, given that the trial court’s

 determination that a single ground for termination exists is sufficient, in and of itself,

 to support the termination of respondent-father’s parental rights in Natasha, In re

 E.H.P., 372 N.C. at 395; the fact that respondent-father has not argued that the trial

 court’s determination that the termination of his parental rights would be in

 Natasha’s best interests constituted an abuse of discretion; and the fact that

 respondent-father’s challenge to the quality of the representation that he received
 IN RE N.B., N.M.B., M.R.

 2021-NCSC-53

 Opinion of the Court

from his trial counsel lacks merit, we affirm the trial court’s order terminating

respondent-father’ parental rights in Natasha as well.

 AFFIRMED.